AO 106 (Rev. 7/87) Affidavit for Search Warrant

# United States District Court

DISTRICT OF RHODE ISLAND

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)
9 Udell Street, 2nd Fl.Apt., Prov., RI, 2nd floor of a 2 family home, white in color, brown roof. To the right of front door is #9, color black. There is a metal fence on the right side of premises, wood fence in back. In front, there is a light brown awning. The entrance is on east side of house, there is a white door that leads to staircase heading to second floor

## APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT

CASE NUMBER: 1:05-M-131M

I Craig A. Marech being duly sworn depose and say:

I am a(n) Special Agent, United States Secret Service and have reason to believe
Official Title

that ☐ on the person of or ☒ on the property or premises known as (name, description and/or location)

9 Udell Street, 2nd Fl. Apt., Prov., RI, 2nd floor of a two family home, white in color,brown roof. To the right of front door is #9, color black. There is a metal fence on the right side of premises, wood fence in back. In front, there is a light brown awning. The entrance is on east side of house, there is a white door that leads to staircase heading to second floor

in the ______ District of Rhode Island

there is now concealed a certain person or property, namely (describe the person or property to be seized)
See Attached "Schedule A - Items to be Seized"

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)
Property that constitutes evidence of a criminal offense

concerning a violation of Title 18 United States code, Section(s) 1344, 371.
The facts to support a finding of Probable Cause are as follows:
See Attached Affidavit of Special Agent Craig A. Marech, United States Secret Service

Continued on the attached sheet and made a part hereof. ☒ Yes ☐ No

[signature]
Signature of Affiant

Sworn to before me, and subscribed in my presence

11-08-2005 at Providence, Rhode Island
Date City and State

David L. Martin, United States Magistrate Judge [signature]
Name and Title of Judicial Officer Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

# AFFIDAVIT

I, Craig A. Marech, being duly sworn, deposes and says:

1. I am a Special Agent of the United States Secret Service ("Secret Service") and have been so employed for approximately four years. During my employment as a Special Agent with the Secret Service, I have conducted numerous investigations concerning bank fraud and conspiracies to commit bank fraud. I have received training in means and methods used by those engaged in bank fraud. I have executed and/or assisted in the execution of several federal search warrants for various fraudulent documents, records, and proceeds derived from individuals engaged in various bank fraud schemes.

2. I submit this affidavit in support of the United States' application for a warrant to search the premises located at 9 Udell Street, 2nd Floor Apartment, Providence, Rhode Island (the "Premises"), the residence of an individual named Anthony Dimeo ("Dimeo"), including the contents of any safes, lock-boxes and computers that are stored within the Premises. The Premises are more particularly described as the second floor of a two family home that is white in color, with a brown roof. To the right of the front door on Udell Street is a number "9" that is black in color. There is a metal fence on the right side of the Premises and a wood fence in the back of the Premises. In the front of the Premises, there is a light brown awning. The entrance to the Premises is on the east side of the house, where there is a white door that leads to a staircase heading to the second floor of the address.

3. The purpose of this application is to seize evidence of a violation of 18 U.S.C. § 1344, which makes it a crime to knowingly execute or attempt to execute a scheme or artifice to defraud a financial institution or to obtain moneys, funds, or other property owned by, or under the custody or control of, a financial institution, by means of false of fraudulent pretenses, representations or promises, as well as a conspiracy to commit bank fraud, in violation of 18 U.S.C. § 371.

4. The statements contained in this affidavit are based in part on information provided by Special Agents of the Secret Service, members of the Rhode Island State Police and Providence Police Departments, records obtained from Citizens Bank ("Citizens"), interviews of cooperating witnesses, law enforcement surveillance, audiotapes and videotapes. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence of a violation of Title 18, United States Code, Sections 1344 and 371 are located at the Premises.

***Overview of the Investigation***

5. Based on the evidence described below, there is probable cause to believe that Dimeo is an active participant in a sweeping bank fraud scheme in which more than 50 participants have been identified. As part of this scheme, college-aged individuals (many of whom are current and former students of Johnson & Wales University) are recruited and paid approximately $1,500 apiece for their participation in the scheme. The scheme involves a check with insufficient funds being deposited into the college-aged individual's Citizens Bank account. The following day, before Citizens Bank is able to discover that the check of deposit is worthless, checks are cashed and a withdrawal is made from the account at three different branches of Citizen Bank. Citizens records indicate that this nearly identical pattern has occurred in the accounts of approximately 53 college-aged individuals during the period of March 2005 through November 2005. As a result of this fraudulent activity, Citizens Bank has incurred a total approximate loss of $566,000.

6. As described below, investigation has revealed that Dimeo is a key participant in this conspiracy, and that individuals named Joseph D'anna ("D'anna") and Charles Lambert ("Lambert") have actively assisted Dimeo in this criminal activity, by, among other things, recruiting college-aged individuals to participate in the scheme and depositing worthless checks into their accounts. Furthermore, there is probable cause to believe that Dimeo maintains and stores instrumentalities and fruits of this criminal

activity at the Premises.

Citizens Bank Records

7. A fraud investigator at Citizens Bank in Rhode Island has provided the Secret Service with bank records involving a fraudulent check cashing scheme that has been taking place at Citizens Bank from March 2005 through the present. During the period of March 2005 through November 2005, bank records reveal that Citizens Bank has incurred a total approximate loss of $566,000 as a result of this scheme, which involved the bank accounts of approximately 53 different college-aged individuals.

8. A review of the transactions surrounding these 53 different account holders revealed numerous overlaps in the identities of the individuals depositing the checks into the various accounts, withdrawing the funds from the various accounts as well as the names listed on the checks of deposit. In particular, bank records reveal the participation of D'anna in at least twelve of the aforementioned transactions. Checks written on D'anna's account are the checks of deposit on several of the transactions and D'anna was captured on bank surveillance equipment on at least five occasions depositing the checks with insufficient funds into the accounts of the college-aged students.

9. A review of bank records and bank surveillance photography also revealed the extensive involvement of Lambert. In particular, on March 30, 2005 and March 31, 2005, Lambert was photographed depositing fraudulent checks totaling $18,700 into his own Citizens account. On March 31, 2005, Lambert was also photographed withdrawing

approximately $14,000 from that account at 4 different branches of Citizens Bank. Lambert was also photographed on June 14, 2005 depositing a $4,900 check with insufficient funds into the bank account of one of the college-aged students. The next day, June 15, 2005, before Citizens Bank learned that the aforementioned check was returned for insufficient funds, $14,000 was fraudulently withdrawn from the account at three different Citizens branches.

Information Provided by Cooperating Witness

10. On September 28, 2005, I interviewed a cooperating witness ("CW"), who stated that he had recently been approached by an individual later identified as Joseph D'anna. According to the CW, D'anna requested the CW's bank account number at Citizens Bank as well as some biographical information. D'anna told the CW that he would deposit a check into the CW's Citizens Bank account and the next day someone would drive the CW to different Citizens Bank branches to cash checks. The CW stated that he was to be paid by D'anna for his participation in this scheme. After the CW learned that $4,950 had been deposited into his account, he decided not to proceed with the scheme and reported this activity to law enforcement.

Information Provided by D'anna

11. On October 21, 2005, I and other Secret Service agents interviewed D'anna. After advising D'anna of his constitutional rights, D'anna proceeded to provide a lengthy oral and written statement concerning the aforementioned bank fraud conspiracy. D'anna first stated that Lambert's role is to recruit new college-aged account holders. D'anna indicated that he also recruited a large number of college-aged students to participate in this fraudulent scheme.

12. D'anna further stated that after the account holder agrees to participate in the scheme, Dimeo text messages the account holder's information to D'anna with the amount in which each check is to be written. Next, D'anna writes a check in the amount indicated by Dimeo and deposits it into the account holder's account. According to D'anna, the next day, a driver named "Andy" LNU, Lambert, D'anna and the new recruit meet at an agreed upon location in Providence, where D'anna provides to "Andy" LNU checks that are to be used to withdraw money from the account holder's account. Lambert and "Andy" LNU then drive the account holder to three different Citizens Bank branches where funds are withdrawn.

13. According to D'anna, the college-aged account holder is then paid approximately $1,500 and "Andy" LNU, Dimeo, and Lambert return to D'anna's residence where they divide up the remaining monies fraudulently withdrawn from the banks. According to D'anna, "Andy" LNU receives approximately $750, Lambert and

D'anna each receive approximately $1,500, and Dimeo keeps the remainder, typically between $9,000 and $10,000. As mentioned above, Citizens Bank records reveal that this pattern has taken place on approximately 53 different occasions between March and November 2005.

14. D'anna also provided detailed information concerning Dimeo's use of the Premises to store proceeds and instrumentalities of the criminal activity. Specifically, D'anna has informed law enforcement that as recently as October 31, 2005 he has seen stacks of currency on the dining room table in the Premises. D'anna also reported that Dimeo stated that there was a large quantity of currency in the bedroom of the Premises and that Dimeo has a safe within the Premises where additional currency is stored. Moreover, D'anna told law enforcement that he has seen on different occasions various check-books in the names of various individuals that were being stored in the dining area of the Premises. Finally, D'anna stated that Dimeo has provided him with numerous worthless checks and instructed him to deposit those checks into the college-aged individuals' bank accounts.

Recorded Conversations Between Dimeo and D'anna

15. D'anna agreed to cooperate with investigators during his interview with Secret Service agents on October 21, 2005. On October 26, 2005, D'anna and Dimeo participated in two consensually monitored and recorded telephone calls. During these recorded conversations, D'anna stated, in sum and in substance, that he was having

difficulty finding new "kids" to take part in the scheme because they did not need the money. Dimeo responded, in sum and in substance, by authorizing D'anna to agree to pay the "kids" $2,000 each for their participation in the scheme, instead of $1,500 that they previously had been paid.

November 3, 2005 Bank Fraud and Law Enforcement Monitoring Thereof

16. On November 2, 2005, Dimeo sent a text message to D'anna. D'anna has turned that message over to law enforcement. In that text message, Dimeo provided the name of a college-aged individual, that individual's Citizens account number, date of birth, partial address and the last four digits of his social security number. Later that day, Dimeo called D'anna and instructed him to write a check in the amount of $4,950 and to deposit that check into the Citizens account number that was contained in the text message.

17. On November 3, 2005, law enforcement officers conducted extensive surveillance and video and oral recordings of Dimeo, D'anna, and Lambert as they were participating in the bank fraud scheme. In particular, agents observed D'anna arrive at an agreed upon location and provide checks totaling $9,225 to "Andy" LNU, who was in the driver's seat of a blue Pontiac Bonneville automobile. Agents then observed Lambert enter the aforementioned vehicle. The vehicle, being driven by "Andy" LNU, then departed.

18. Citizens bank records reveal that three checks were negotiated on this account at three different branches of Citizens during the morning of November 3, 2005. Bank surveillance equipment captured the college-aged student negotiating these checks, all of which were later returned for insufficient funds. That day, Citizens absorbed a total loss of $14,075.

19. During the time of the aforementioned fraudulent transactions, agents surveilled and recorded Dimeo arriving at D'anna's residence. Dimeo and D'anna proceeded to engage in a lengthy consensually monitored and recorded conversation, during which Dimeo discussed various details of the fraudulent scheme, including the checks that were being negotiated that day by the college-aged student, Lambert's recruiting efforts, a particular incident in which one of the college-aged students kept all of the funds herself, and various steps that needed to be taken to further the scheme that day and in the future.

20. At approximately 10:50 a.m., agents observed the aforementioned Bonneville arrive at Danna's residence. Agents observed Lambert and "Andy" LNU leave the vehicle and enter D'anna's residence. Inside the residence, agents captured on audiotape and videotape all of the aforementioned individuals discussing the bank transactions that day and dividing up the proceeds of the criminal activity. Agents captured on videotape Dimeo dividing up the proceeds of that day's bank fraud and paying large sums of cash to both D'anna and Lambert. Lambert, in turn, was recorded on audiotape paying "Andy"

LNU his share of the proceeds. (D'anna subsequently turned over to agents his share of the criminal proceeds that day, $1,720.) Dimeo was further recorded on videotape taking the remainder of the cash, stuffing it in an envelope, and putting that envelope in his pocket.

21. On November 3, 2005, after Dimeo left D'anna's residence with the envelope that had been stuffed with cash, he was surveilled by law enforcement. Officers observed Dimeo drive straight to the front of 9 Udell Street, where Dimeo left his vehicle and entered the Premises.

Evidence Likely to Be Found at the Premises

22. As described in detail above, there is overwhelming evidence, including law enforcement surveillance and video and oral recordings, that Dimeo is an active participant in this bank fraud conspiracy. Moreover, there is probable cause to believe that Dimeo uses his personal residence, the Premises, as a location at which he stores the proceeds of the criminal activity and instrumentalities used to commit bank fraud. As detailed above, D'anna has informed law enforcement that he has observed large amounts of cash inside the Premises and that Dimeo has informed him that he keeps additional currency in the bedroom and a safe within the Premises. D'anna has also stated that he has observed numerous checkbooks in the names of various individuals in the dining area of the Premises. As demonstrated by the audio and video-taped evidence described

above that corroborated the information provided by D'anna, the information provided by D'anna had proven trustworthy and reliable.

23. In addition to the information concerning the Premises that was provided by D'anna, law enforcement officers surveilled Dimeo traveling straight to the Premises after he left D'anna's residence on November 3, 2005. As detailed above, prior to traveling to the Premises, Dimeo was videotaped stuffing into his pants an envelope containing thousands of dollars, representing a large portion of the bank fraud proceeds that had been derived that day.

24. Based on my training and experience, I submit that there is probable cause to believe that cash proceeds of the bank fraud conspiracy will be found at the Premises, including within a safe or lock-box that is stored in the Premises. This belief is based on: (i) the fact that Dimeo was surveilled on November 3, 2005 entering the Premises immediately after stuffing into his pants pocket an envelope full of the cash proceeds of that day's criminal activity, and (ii) information provided by co-conspirator D'anna concerning Dimeo's storage of large amounts of cash within the Premises. Citizens Bank records reveal that Citizens has sustained approximately $566,000 in losses since the conception of this conspiracy in March 2005. As investigation and surveillance has revealed that Dimeo himself has captured the bulk of these funds, there is probable cause to believe that a large amount of currency will be found in the Premises.

25. Based on my training and experience, I further submit that there is probable cause to believe that instrumentalities and evidence of the crime of bank fraud will be found within the Premises. As detailed above, Dimeo text messages D'anna with bank account numbers and biographical information concerning the college-aged individuals who participate in this scheme. Law enforcement has custody of at least two of these text messages. There is therefore probable cause to believe that Dimeo stores in the Premises information concerning individuals who have participated in this fraudulent scheme as well as individuals who have been recruited to partake in this conspiracy in the near future. In addition, D'anna has advised law enforcement officers that Dimeo has provided him with various checks drawn on accounts with insufficient funds and instructed D'anna to utilize these checks to further the bank fraud scheme. There is therefore probable cause to believe that instrumentalities of the bank fraud conspiracy, including checks drawn on the names of various individuals, will be found within the Premises.

26. I further believe, based on the extensive evidence of the bank fraud conspiracy discussed above, that various other property that constitutes evidence of the commission of criminal activity, contraband, the fruits of the crime, and property intended for use in committing a criminal offense will be found in the Premises, including, but not limited to: banking records, biographical information concerning bank account holders, bank checks, documents showing dates, names and amounts paid for depositing checks

without value into various bank accounts, address and telephone books containing the names, addresses and telephone numbers of other individuals involved in this bank-fraud conspiracy and United States currency.

27. In my training and experience, I have learned that those involved in bank fraud conspiracies often store evidence of this activity on computers. I therefore believe it likely that evidence of the previously described fraud scheme, including records concerning prior and contemplated fraudulent activity, and records relating to the names and addresses of the individuals who have participated in this conspiracy, will be found in any and all computers found within the Premises. I therefore request that the authority to search the Premises include the authority to search any computers contained therein, under the procedures provided for below.

Search of Computer

28. Based upon my training, experience and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips. I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a. Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of

computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

b. Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

c. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing fifteen gigabytes of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during

a search can easily contain the equivalent of 7.5 million pages of data, which, if printed out, would completely fill a 10' x 12' x 10' room to the ceiling.

d. Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

29. In searching for data capable of being read, stored or interpreted by a computer, law enforcement personnel executing this search warrant will employ the following procedure:

i. Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will make an

initial review of any computer equipment and storage devices to determine whether these items can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve the data.

ii. If the computer personnel determine it is not practical to perform an on-site search of the data within a reasonable amount of time, then the computer equipment and storage devices will be seized and transported to an appropriate law enforcement laboratory for review. The computer equipment and storage devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

iii. In searching the data, the computer personnel may examine all of the data contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein. In addition, the computer personnel may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

iv. If the computer personnel determine that the data does not fall within any of the items to be seized pursuant to this warrant or is not otherwise legally seized, the government will return these items within a reasonable period of time not to exceed 60 days from the date of seizure unless further authorization is obtained from the Court.

30. In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

i. Any computer equipment and storage device capable of being used to commit, further or store evidence of the offense listed above;

ii. Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

iii. Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

iv. Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software.

v. Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

vi. Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage

devices or data; and

vii. Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

Conclusion

31. Based upon the above, and on my training and experience, I have probable cause to believe, and do in fact believe, that within the Premises to be Searched, described in this affidavit, there are seizable items as described in Schedule A - Items to be Seized. The items sought to be seized constitute the fruits, instrumentalities, and evidence of the crimes described herein. Accordingly, it is respectfully requested that a search warrant be issued for the seizure of the identified items described in this Affidavit.

CRAIG A. MARECH
Special Agent,
United States Secret Service

Subscribed and sworn to before
me this 8th day of November, 2005,
in the District of Rhode Island.

David L. Martin

Hon. David L. Martin
United States Magistrate Judge

# SCHEDULE A -ITEMS TO BE SEIZED

1. United States currency.

2. Any and all bank records, including all bank account statements, checks, checkbooks, check registers, copies of checks written, withdrawal slips, documents reflecting the depositing of funds, financial statements, wire transfers, checking account information, deposit information to include safety deposit box records, credit debit memo records, business financial records, business files containing account history or individual transactions or mailings, currency, state and federal tax records.

3. The contents of any safe or similar item that may used to store the fruits of the alleged scheme, including cash.

4. All documents containing the names, addresses, telephone numbers, dates of birth and/or social security numbers of any other individual, including all address and telephone books.

5. All utility bills including all telephone bills and record.

6. All cellular telephones, palm-pilots and electronic devices through which electronic messages may be transmitted, including any and all computers stored in the Premises.

7. All other records and documents that constitute evidence, contraband, the fruits, and property intended for use in committing a violation of Title 18, United States Code, Sections 1344 and/or 371.

8. As used above, the terms records, documents, programs, applications or materials includes records, documents, programs, applications or materials created, modified or stored in any form.

9. In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth in the affidavit submitted in support of the instant application for a search warrant:

i. Any computer equipment and storage device capable of being used to commit, further or store evidence of the offenses listed above;
ii. Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;
iii. Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;
iv. Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software.
v. Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;
vi. Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and
vii. Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.